The first case called for oral argument is Michael v. Precision Alliance Group. Counsel, whenever you're ready, you may proceed. Thank you, Your Honor. May it please the Court. My name is Fern Wolf and I represent the plaintiffs in this retaliatory discharge case about a company that was selling underweight bags of soybean seeds in the hope that it would not get caught. Again, I represent the plaintiffs who are here today, Alan Holman, Craig Clumpy, and Wayne Michael, who were former employees who engaged in protective activity by providing information which brought to light this unlawful activity. The State of Illinois Department of Agriculture used the information that the plaintiffs provided to conduct a surprise inspection in February of 2003 at the company's Nashville soybean processing facility. And the State ended up issuing a stop-sale order prohibiting the sale of certain seed. And afterwards, the defendant had no choice but to comply with the law and repackage its seed, thereby affecting its bottom line. The defendant's managers were livid and, as threatened, fired the people involved with interfering with their plan to sell underweight bags of seed to the farmers. The elements of a retaliatory discharge case are three elements. Protected activity, number one, the plaintiffs had to have engaged in protected activity, which I'll talk about because it gets subdivided. Number two, they have to have been discharged, and there's no question they were discharged. Three, the discharge has to be causally related to the plaintiffs' protected activity. First, with regard to the protected activity, one of the issues in this case was the form of the plaintiffs' protected activity because they supplied information to the State, but they did not talk to the badge holders, if you will, the people who work for the State. Instead, they supplied it to another person for the purpose of getting that information to the State. The State wanted the information, which was which lot numbers, which bags were involved, where could they be found in the plant. And the plaintiffs supplied that information. They gathered the information by weighing bags of seed. And these bags are enormous. They're about this wide, and they're about up to here, I think. And they're really big. They weigh 2,000 pounds. They're not like this little bag, but this is soybean seed. And they weighed the bags. They provided the information to another person who used to work with the plant but was not a co-worker anymore, who used to work at the plant, for the purpose of getting that information to the Department of Agriculture. And the Department of Agriculture was looking for the information, actually went out and conducted this raid in February of 2003. And again, as a result, the State ordered the defendant to stop selling the seed. In the record, it's on page A170, and there's a bunch of these. The defendant was prohibited from selling the seed in the state of Illinois because it would violate state law. The second part of the public policy issue, that first element, is whether the kind of conduct the defendant engaged in implicates public policy of the state. And it does in several different ways. Number one, I think it's pretty clear that the Department of Agriculture thought this was pretty important when they stopped the sale of seed. You can't have mislabeled seed going out there to the farmers. There's a very big risk or economic concern for the farmers because what the farmers do is they put these seeds, they put them in their planters, and they spread them around thinking that there's going to be a certain number of seeds and they're going to have a certain population of soybeans growing. And then when they get to the end of what's in their seeder, they find out they don't have enough. And it's too late to go and shop. It's not like going to the grocery store. It's too late to go and shop and buy some more seeds of the same variety. And so they're stuck. They're going to be underpopulated, and they're going to make less money. And they're on a slim enough profit margin as it is not to be able to plant everywhere that they can plant. So public policy is implicated. The Illinois Waste and Measures Law actually makes it a crime if there are four incidents of selling underweight commodities. And here there were over 100 incidents that the company was cited for. So it certainly would be a crime. It's also just plain old fact. If you get money from people, the end users, for a pound of something, and you're only selling them 15 ounces, you're stealing from them. You're stealing by deception. And that violates the public policy of the state of Illinois as stated in the Seminole case, Palmatier, which is that there is no rights more fundamental than the life and property of the citizens of our state. How do you respond to the defendant's statement that the undisputed evidence establishes that the company had no knowledge of plaintiffs' bag-weight activities when it discharged them? Well, I think a trio of fact could disagree based on circumstantial evidence, including the fact that all three plaintiffs were threatened. They were all told, two of them were brought in together and one was brought in separately by different managers, and said, you know, whoever did this is going to be fired. So your argument is that's not appropriate for summary judgment? Exactly. Intent is not appropriate for summary judgment. Other evidence in the record is a memo, a typewritten memo, by one of the managers where there's actually two typewritten memos, one where he figures out right away that this information had to come from the inside, either a current or former employee, and then a follow-up memo where he realized it had to come from a current employee. So again, it's a question of intent and it's something for the trio of fact to decide. The timing of the discharges of these three people also lends support to the element of intent and knowledge because they were fired really on the heels of the entire episode. I think the company needed everybody around through February to re-weigh the bags, to bring in all these trucks of bags, and to refill the bags. And after that was over, then the firings began. Also, Alan Homan and Wayne Michael, even though they were supposedly fired as part of a reduction in force, were ineligible for rehire. Now, in the employment law world, when people are fired as part of a reduction in force, they're usually told, you know, yeah, you can come back. If things get better, we want you back. But when there's something else going on, then they're ineligible for rehire. And so this was no neutral reduction in force. And that all goes to intent. Ultimately, this is really a simple case. The plaintiffs reported unlawful activity and they got fired. And it should be a question of that for the trier effect to decide whether there is that causal connection. If there are no other questions. I don't believe there are. Thank you, counsel. Thank you. Counsel? Thank you. May it please the court, my name is Julie Gottschall. I am appearing on behalf of the appellee, Precision Soya. It is so tempting to stand up here and use my time to try and rebut some of the many statements that have been made by my opposing counsel about the motive of the company and what was going on with regard to the state investigation. What I want to do before I get to the heart of my argument is simply reassure the court that my client is a very conscientious employer, a very conscientious vendor in the marketplace that is sitting here today. And when the panel looks at the record, reads their affidavits and sees what was really happening here, I am satisfied that the court will be assured that they acted responsibly at every turn. This is not a situation where they were trying to deliberately rip anybody off or steal anything. In fact, that completely misunderstands their business model and how they work. There would be no incentive to do that. There would be no benefit to doing that. They were having a problem. And they have owned up to that problem in every step of the way that for some reason the bags that they had packaged at proper weight over proper weight were turning up to, for some reason, environmental factors or something, lose some density in the warehouse. And so, yes, there were bags in the warehouse that were underweight. And, yes, the Department of Agriculture did, when they came in and found those bags, put a stop-sale order on some of those bags. These were not in the marketplace. They were not sold. So you will find all of that in the record. And I do want to make that clear. But that is not what this case is about. This case is not about whether they were engaged in bad commercial acts or not. What it is about is the plaintiff's activities. And that's what I want to focus on. As counsel has already advised the court, they need to show evidence from which a jury could find three elements to be met for a wrongful discharge case. And those are that they were discharged, and there's certainly no dispute about that, that the discharge was in retaliation for their protected activity, and that that discharge violated a clear mandate of Illinois public policy. And it's our position, and indeed the trial court in part agreed with us, that they can't meet three elements in that test. They can't show protected activity. They can't show a clear mandate of public policy. And they certainly cannot show a causal connection. With regard to protected activity, let's start there because that's where the court found in our favor. Their theory now, and it has varied, but apparently now they've settled on a theory that they were terminated because they assisted Mr. Dudley, a former employee of the company, to make a report to the state. Now context is telling here. What happened was Mr. Dudley was terminated for horseplay. Now everybody was aware that there was an issue with underweight bags in the warehouse. The company was trying to solve the problem. They had worked with these individuals. They said, go out, find the bags, and we're going to fix this. So people were aware of that problem. Mr. Dudley said, you know, if they deny me my unemployment after being fired for misconduct, then I'm going to play hardball with them. They want to play hardball with me, I'll play hardball with them. Sure enough, his unemployment request was denied, and so he contacted his buddies in the warehouse and said, I need low bag weight numbers. Now the idea that he was somehow deputized by the Department of Agriculture is simply not in the record. What is in the record is Mr. Dudley's testimony that he went to the Department of Agriculture and said, I think I may want to make a report of a company out there with underweight bags. And they said, you know, if you decide you want to do it, get us some bag numbers. They didn't know if he was employed or not. There's nothing in the record that would suggest that they had authorized him to go in and ferret this information out using other people. But in any event, he contacted them. They agreed to give him this information. That, Your Honor, is not protected activity, and there is no case law that has been cited by my opponents and none that I have run across where an Illinois court has said that individuals feeding information to a disgruntled former employee is protected activity. The cases say, and again, the Supreme Court has been very, very clear and reiterated many, many times, most recently in the Turner case, that this is a narrow tort, supposed to be narrowly construed. This would be a vast expansion of what this tort is to say, you know what, you don't have to go to the authorities yourself. You can go to your buddy and give him information, and we'll protect that as well. That is not protected whistleblower activity. You'll find also support for that narrow reading of the tort in the Illinois Whistleblower Act. That, too, is a narrow law where the legislature has decided we shouldn't expand this theory to go to facilitating other people. It's got to be you go. You blow the whistle. Then we will protect that. Are you saying that the only way the Department of Agriculture could ever discover low bag weight is if they did it on their own investigation? They could go in at any time. But what if somebody reported that to them? Don't they have a responsibility, as they did here, to go forward? I don't know what their responsibility is, but nonetheless, that's not the issue. The issue is whether what these individuals did, maybe we'd have a different case if they went to the department themselves. They didn't do it. They didn't do it. They gave the information to Mr. Dudley. That is not protected activity, and that's what the court properly found. Again, you'll see, as you read through Turner, this idea that we've got to narrowly construe this court, and not everything that somebody does that may somehow benefit a public policy or may be in the betterment of the common good or may be in accordance with the law, not all of that activity is protected. But still, there is no case where they say going to your co-worker, giving somebody else the information, is protected activity. Does it make any difference that they gave it to him knowing he was going to give it to the authorities? I don't believe it. I mean, you could talk to somebody at the tavern and tell them this is going on, and I can see that. But if you go with them with the purpose of taking it to the state, it just seems ridiculous we wouldn't make that connection. But that's the purpose, isn't it? Yes. Your Honor, again, there is no authority that says that that is protected. And, again, there is a lot of dicta from the Supreme Court saying let's not expand this door. That would be an expansion of the door. The Illinois whistleblower law recognized that as well. You have to draw the line somewhere, and this is a nice, bright place to draw the line. It seemed like Turner was more on whether it was the public policy of the state that was not how the information got to them. It was clear in that case how the information got there. But you think that Turner, just because it's restrictive overall, would be it's restrictive on this point too? That's right. Okay. That's right. And I can get to that next. I just want to make a point that it seems like the argument, plaintiff's argument that they made internal reports has fallen away. That was not raised again in their reply brief wisely, I think. As has their belief argument that seems to have fallen away as well. In other words, the fact that management believed that they may have gone to the state when, in fact, they didn't go to the state. So I will not unless the court would like me to address those arguments. Okay, so let's go on to what I believe is the second independent basis for upholding the summary judgment, and that is the fact that there is no clear mandate of public policy here. And again, the Illinois case law is very specific that for this court to be recognized, the plaintiffs have to be acting in furtherance of a public policy that strikes at the heart of citizens' rights or duties, health and safety, affects the citizens collectively, and isn't purely commercial interest. Can I interrupt you there? Yes. Judge Hatch found that paragraphs A and D of his order were violations of the public policy of the state of Illinois, didn't he, on the last page of his order? He did. So you're disagreeing with his order. Yes. You didn't file a cross appeal. No. And a summary judgment, ruling against somebody on a summary judgment isn't appealable without a special finding, a 304 finding. I'm just wondering how we could, you're asking us to rule in your favor for reasons other than what Judge Hatch ruled in your favor. That's correct. And there is some authority in my brief that says that the appellate court is entitled to uphold the summary judgment on any basis that's in the record, even if it is not the basis on which the trial court granted summary judgment. So you'll find that in there. So for a clear mandate of public policy, what do we have here? The plaintiffs have cobbled together a number of different policies, some because they cite seed in the title, some because they have weights and measures in the title. But simply citing to those statutes is not enough. And again, there's case law that says that. When you drill down and you look at what they have cited, it becomes apparent that, first of all, there is only one act that could arguably be in play here, and that is the Illinois Seed Law. I'm sorry, that is the Illinois Weights and Measures Act. That's the only act that is implicated at all by what they allege defendants have been doing, which is under filling the bags. The other ones don't address weights. They may address the type of seed arguments. They may talk about, you know, standards generally for commercial. But there's nothing that is implicated here. The one is a federal law that just simply talks about running studies to show, you know, different standards of technology and things. Again, addressed more clearly in my brief. Is that 505 Illinois Compiled Statutes 110 that is arguably the? If that's the Illinois Weights and Measures. I think it is, but I'm just trying to double check with Judge Hatch's order. No, it's not what Judge Hatch found, and that's what I found so curious about his decision. He found that it was Illinois Seed Law, but that, if you look at it, doesn't address weight. It addressed types of seeds, and there has to be purity in the bag and things like that. So with due respect to Judge Hatch, on this ground I think he got it simply wrong. Okay. That the only ones that could apply, it even arguably is in play, is the Illinois Weights and Measures Act. The rest of them have nothing to do with it. Now, when you look at that act, clearly throughout the act it speaks of commercial interest, economic interest. Not to say that it's not important that the bags weigh what they purport to weigh. Nobody's arguing that. My clients wouldn't argue that. But it is to say that that is a relatively narrow commercial interest here. If you look at their business model, they never sold seeds. They conditioned the seeds on behalf of Monsanto and the other big seed vendors. So this would be an issue between them and the seed vendors if the bag somehow lost some capacity. Again, nothing to suggest that they were introduced into the stream of commerce. But when you look at the case law, it is- They were intended to be introduced. Well, no, Judge, there were procedures, and again, I don't want to belabor this too much, but there were procedures to ensure that they shipped out, actually weighed what it was supposed to weigh. These were bags that were lying dormant in the warehouse. Now, the idea was ultimately yes, but that doesn't mean that- So they would start in the trail of getting into commerce and they might be caught. Yes. Okay. Yes, and in fact, you'll see the plaintiff's own testimony about how they were trained to find out whether bags were underweight. And this was the focus of the business. And indeed, management was livid when they found out that somebody had given numbers to the state. What they should have done, and plaintiffs admit this, is gone to management and fixed the problem. That's what they were supposed to be doing. So yes, they were upset that somebody internally would have not fulfilled that fundamental job responsibility and instead gone to the state with this information. But you will find no case law, again, where these statutes have been used to anchor a claim. This would be a novel theory, an expansion of the tort. And granted, the case law is not completely clear on what constitutes a public policy, but what is clear is that it is supposed to implicate health and safety issues, very fundamental issues. This doesn't rise to that level. Now, of course, they've tried to shoehorn this into a criminal claim as well. They didn't treat it like a criminal claim, and it is indeed a stretch to believe that this was theft or deception or anything that could be subject to any kind of criminal prosecution. You don't think that a form of commercial fraud is prevention of that as a public policy when you've got a situation where your client is in control of the means by which they can ascertain if these bags are filled properly. They attempt to put them into the stream of commerce. They may or may not be noticed that they are underweight, and by your own admission in your oral argument, by the time an unsuspecting farmer has used the seeds, planted them, and winds up with an underpopulation in a given acreage, it's too late for any type of remedy. You don't think prevention of that might come under the umbrella of an important public policy that is covered by retaliatory discharge jurisprudence? Let me unwind that a little bit. First of all, that wasn't my oral argument. That was my opponent's oral argument. But can there be certain circumstances? Look at the record here. That isn't here. There's multiple layers of speculation and theory, and frankly, aren't those aspects all for the trier of fact? Don't you have an inherent problem in your position that you have genuine issues of material fact here? No. No, I wouldn't concede that. Certainly whether something constitutes a fundamental public policy is an issue for the court to decide. That is not for a jury to decide. Here, again, this was not treated as a criminal violation by the people. The idea that this is theft and deception takes so many assumptions that if they had introduced it into commerce, if this had been a deliberate course of conduct. So there are many, many things that are simply not supported by the record here. And it is their obligation in imposing a motion for summary judgment to conform with the evidence from which a reasonable jury could conclude this. How is firing someone, or the motive or reason for firing someone, not a question of fact? Because there has to be some evidence from which a jury could conclude, other than just maybe that they knew that these individuals had engaged in this conduct and that that was the motivation for the termination. And again, if you look at the cases that I've cited, Illinois courts have been very clear. They're not going to follow McDonnell-Douglas. They're not even going to shift the burden. They view it as the plainest burden to conform with some affirmative evidence that would justify finding that, in fact, that was the motive. Now, you've got cases... So what case says motive is appropriate for summary judgment? Well, if motive is... There has to be some evidence from which motive can be discerned against. And if you look at the Adams case, for instance, you will see that in those cases, the court found, you know what? The evidence presented by the defendant as to the reason for termination is so compelling, and plaintiffs haven't come forward with enough to rebut that such that we find they cannot show they have failed to meet their burden of showing evidence of a causal connection. And those are RIF cases, and that's important because that's what we have here. You know, it is not sufficient for plaintiffs to simply come forward and say, well, I think he may because he looked at me funny. And, again, there's a case that says that that is cited in my brief. You know, the fact that your manager met with you and said, that's the final straw when you were in a meeting about the protected activity is not enough for a jury to conclude that that was the reason for the termination. You have to give something more. That if a fact finder believes it can be the reason for the termination. Now, here, there's two problems. First of all, there's nothing in the record to suggest that they knew that these guys did what they did, which in and of itself we are just not protected activity, but overlooking that, they didn't know that they gave the information to Sean Dudley. What they've got is they've got, you know, the manager saying if we ever find out who does this, that could be a very job-threatening thing. That's not enough for a jury to conclude that they knew. And, again, this is an area where Judge Hatch disagreed with you on, and you're wanting us to rule in your favor based on something that he determined was a factual question also. That's right. Okay. I think Judge Hatch got it wrong there as well. Okay. So what you've got here, then, you've got very legitimate and fully supported by the record on undisputed facts reasons for these individuals to be terminated. You've got Alan Holman, who engages in horseplay. Look at his testimony. He knew that was a violation of the rules. He was trained. He admitted he did it. He admitted he knew it was wrong. And they fired him. And now we have a case based on that termination? Then you've got a reduction in force. And, again, look at the facts on the reduction in force. This is something that was directed by corporate headquarters, a different office. And look at the numbers. They're in Gary Shepard's affidavit. Look at how business has declined. The company said, you know, we have to cut back. You've got to cut four people. And the managers went out, and they met together, and they decided on those four people. How did they decide? Well, you'll see in their affidavits there's a constellation of factors they used. The typical stuff. Attitude, skill set, past performance, possibility for advancement. And they rated, they picked four people who were at the bottom of the heap. These two, the two that were terminated here, consistently ranked at the bottom of the class for 2001 and 2002. They'd gotten the poorest job evaluations of the people who were still there. The managers had met a year before and said, hey, let's make sure that our performance evaluations are really matching what our two expectations are. And they ranked these guys at the bottom. They terminated four people, two others not part of this. Those people were not replaced. There's nothing in the record that suggests that this riff was concocted for the purpose of getting these people out. This was a legitimate riff. And all of the evidence supports that. So looking at Turner again. Turner recognized that there's a balancing act that has to take place here. For the avoidance of frivolous suits, that's one of the things they cite. This is an absolute perfect example of a frivolous suit. These are two individuals, three individuals with the poorest performance who helped a co-worker to exact revenge on the company. That one was terminated for worst late clear violation. You can finish your sentence. The other two terminated in a riff that is not the stuff of which this narrow tort is meant to address and summary judgment should be upheld. Thank you. Thank you, counsel. Thank you. The purpose of the retaliatory discharge tort is to protect the public. And that's exactly what my clients were doing. They were protecting the farmers and ultimately the people who eat food, who rely on soybeans, from putting underweight bags of seed in the market and thereby affecting the food supply. This is not a conscientious employer. A conscientious employer doesn't say when it's caught by its employees, we haven't been checked in four or five years, we'll fix it next season, let's hope we don't get caught. And that's a quote and it's in the record. The seeds were in the marketplace after the defendant got caught. They recalled bags of seed. There were truckloads of seed coming back. And the plaintiff spent a couple of weeks refilling, reweighing bags that were already in the marketplace. With regard to Sean Dudley, his motive is irrelevant. The Department of Agriculture knew that Sean Dudley was a disgruntled former employee. He told them so. With regard to directly communicating with the state, you know, workers' compensation retaliatory discharge is protected by this same tort. And not very many employees, maybe some employees who get injured, they don't file their own claim. They have a third person do it. They have a lawyer do it. They don't have direct communication, yet they're still protected. They're still protected by the tort. Because the point is, is that we don't want to discourage people from exercising their protected rights. Do you disagree that the record would show that the employer had no legitimate non-retaliatory basis to fire these people? I think that is a question of fact. I think the employer has articulated a non-retaliatory basis for firing each of the employees. But the articulation of that reason, the reason doesn't have to be believed. And the case law says it has to be a valid non-protectual reason, and that it's up to the trier of fact to decide whether that reason is valid and non-protectual. And with the stuff that we, the items of evidence that I talked about in my opening, including the threats, including the by-process of elimination, figuring out who did it, and including the timing, there is enough, as Judge Hatch found, for a trier of fact to decide that the motive was not valid and non-protectual, particularly because two of the plaintiffs were told they were ineligible for rehire. With regard to Turner, this is not a content case. In terms of whether the tort is being expanded by covering the plaintiffs who gave information that got to the state, that the state then used to conduct its raid. And in terms of the belief argument, counsel said that we waived it. Whether the respondent had a belief that our clients actually spoke to the state has not fallen away. On pages 10 and 11 of our reply brief, we specifically addressed that. The defendant keeps saying that the plaintiffs should have gone to management. And they did go to management. And management said, you know, mind your own business. We're going to take care of it later. Let's hope we don't get caught. And that is not the marks of an innocent employer, and this type of behavior needed exposure. It was exposed. This raid would not have happened but for my client's activity, and they shouldn't have been fired because of it. Thank you. Thank you, counsel. We appreciate the briefs and arguments of both counsel, and we will take the case under advisement.